UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- X
:
KEISHANNA RASIN and CHYNNA PITLOCK, : 14-CV-5771 (ARR)(CLP)
:
        Plaintiffs, : <u>NOT FOR ELECTRONIC</u>
: <u>OR PRINT PUBLICATION</u>
  -against- :
: <u>OPINION & ORDER</u>
THE CITY OF NEW YORK; P.O. CHRISTOPHER :
D'ALTO, Shield No. 5804, Individually and in his Official :
Capacity; P.O. MATTHEW T. EVANS, Shield No. 7425, :
Individually and in his Official Capacity and P.O. NICK :
MILENTIJEVIC, Shield No. 8372, Individually and in his :
Official Capacity, :
:
        Defendants. :
----------------------------------------------------------------------- X

ROSS, United States District Judge:

       This case is about an altercation at a juvenile detention facility that spiraled out of control—both before and after police officers arrived on the scene. Plaintiffs Keishanna Rasin and Chynna Pitlock, employed at the facility, bring this action against the City of New York and New York Police Department officers for allegedly violating their constitutional rights by falsely arresting them. Before me is defendants' motion for summary judgment on the grounds that the officers had probable cause to arrest both plaintiffs—in Pitlock's case, because she tried to grab a can of oleoresin capsicum spray ("OC spray" or "pepper spray") from one officer and struck another officer, and in Rasin's case, because for three seconds, she impeded an officer's path as he arrested Pitlock. For the reasons set forth below, I deny defendants' motion.

1

**FACTUAL BACKGROUND**[1]

On September 1, 2014, Rasin and Pitlock were working as youth specialists at SCO Family Services ("SCO" or the "Facility"), a residential detention facility for young women with criminal problems and special needs. See Dep. of Keishanna Rasin ("Rasin Dep."), Ex. B to Decl. of Matthew Shroyer ("Shroyer Decl."), Dkt. #57-2, at 108, 132; Dep. of Chynna Pitlock ("Pitlock Dep."), Ex. C to Shroyer Decl., Dkt. #57-3, at 57-59, 78. Numerous surveillance cameras at the Facility capture much—but not all—of the officers' and plaintiffs' activities on the day in question. See CD-ROM entitled "Video of Arrest Interference," ("Camera __"), Ex. F to Decl. of Karl Ashanti ("Ashanti Decl.") at Dkt. #54-6. These surveillance videos lack audio.

In the mid-afternoon of September 1, 2014, the facility's residents became visibly agitated. Specifically, "[d]uring snack time one youth began to be agitated and all three of them began talking about the next staff member that's coming on and how they can't stand her." Rasin Dep. at 144:12-14. Some of the residents began pulling out drawers, throwing wooden chairs, shoving tables, and breaking windows. Id. at 149:19-150:1; 152:16-17; see also Camera 7 at 13:00. Rasin and Pitlock were both present for portions of this incident. One of the juveniles entered the hallway, and a non-party staff member called for help. Pitlock Dep. at 108:9-15. Defendant police officers D'Alto, Milentijevic, and Evans answered the call, among

---

[1] "The first step in assessing the constitutionality of [an officer's] actions is to determine the relevant facts." Scott v. Harris, 550 U.S. 372, 378 (2007). But on a summary judgment motion, neither a judge nor a jury has had an opportunity to make any fact-findings; instead, a court must look at facts and draw reasonable inferences "in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). However, a court views facts in such a light only where there is a "genuine" factual dispute. Fed. R. Civ. P. 56(c). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380. Because there is "an added wrinkle in this case," namely, the existence of a videotape capturing the events in question, at times I describe three versions of the facts: the parties' disputed accounts as well as the facts depicted in the videotapes. See id. at 378. I do so to set forth my basis for finding that a genuine factual dispute exists in this case despite the presence of relevant videotapes.

others.[2]  See Dep. of Matthew Evans ("Evans Dep."), Ex. E to Shroyer Decl., Dkt. #57-5, at 26-30.  When they arrived, they—along with another officer—began struggling to place one of the juveniles into handcuffs and wrestled the juvenile to the ground.  See Dep. of Christopher D'Alto ("D'Alto Dep."), Ex. F to Shroyer Decl., Dkt. # 57-6, at 47:10-52:13.

**1.    Pitlock's Arrest**

    a.    <u>The Officers' Account</u>

Officer Milentijevic testified that while the juvenile was on the ground, she "was refusing to be handcuffed."  Dep. of Nick Milentijevic ("Milentijevic Dep."), Ex. D to Shroyer Decl., Dkt. #57-4, at 39:2-20.  He observed Officer D'Alto take out pepper spray and tell the juvenile that "he was going to use his pepper spray."  Id. at 42:17-19; 43:2-7.  Officer D'Alto testified that he took out the pepper spray after he "determined that [he] could not put [the juvenile's] hands behind her back."  D'Alto Dep. at 54:3-6.  He testified that when he took out the pepper spray, "all of the sudden a hand come in from behind hitting my hand and hitting the OC spray trying to knock the OC spray out of my hand and that happened twice."  Id. at 57:17-21.  He testified that it was Pitlock's hand that attempted to knock the pepper spray, and that while doing so, Pitlock said "'[d]on't use it, don't use it, she has asthma.'"  Id. at 58:7-25.  Officer D'Alto testified that after Pitlock swiped at his hand a second time, he "deployed the OC spray on the juvenile."  Id. at 64:11-13.

Officer Milentijevic testified that he saw this incident, and that Pitlock "forcefully slapped" Officer D'Alto's hand.  Milentijevic Dep. at 45:2-18.  Officer Milentijevic stated that, as a result, he stood up and spoke to Pitlock, "ordering her to get back at which point [Pitlock] struck [Officer Milentijevic]."  Id. at 48:14-22; 49:3-6.  Finally, he testified that she physically

---

[2]     Plaintiffs have withdrawn their claims for false arrest against Officer Evans.  See Pls.' Opp. To Defs.' Mot. for Summ. J. ("Pls.' Br."), Dkt. #59, at 1.

3

resisted arrest, because "when [he] reached to grab her arm she was pulling her hands away." Id. at 62:7-10.

      b.      Pitlock's Account

Pitlock testified that when the police arrived, she was in a hallway in the Facility "[t]rying to calm [the juvenile] down." Pitlock Dep. at 115:20-22. She testified that the particular juvenile in question was "a special case," and that staff "weren't necessarily allowed to restrain" that juvenile due to the juvenile's medical conditions—including asthma. Id. at 116:10-117:2. After the police officers restrained the juvenile on the ground, Pitlock testified that she "was trying to show [the officers] that [the juvenile] couldn't breathe and that [the juvenile's] eyes [had] started rolling back in her head." Id. at 125:4-7. Pitlock testified that,

> I was telling [the officers] that [the juvenile] couldn't breathe. [The juvenile] was completely sweating, and she has severe heart problems. I was trying to, like, list everything out as fast as I could.

Id at 125:21-24. Pitlock testified that one of the officers pulled out pepper spray, aimed it at the juvenile's face, and sprayed the juvenile—all within a 10-second period. Id. at 131:8-24.

Pitlock stated that an officer came up behind her. She testified that,

> I was frustrated and scared, and I had moved my hands up and I—we could have ran into each other, and I was frustrated because nobody was listening to me, and I was scared of what was happening, because I never witnessed that before. I started to say, I'm just trying to tell you what's going on with this kid. And I was backing up because, you know, we were, like, really close to each other, so I'm, like, trying to talk to the police officer.

Id. at 135:13-17, 135:21-136:1. She testified that any contact made with Officer Milentijevic was not deliberate but was simply a byproduct of the two interacting in tight quarters. Id. at 138:17-139:2.

4

c.  Surveillance Footage

At approximately 3:59 p.m., staff are struggling with one of the Facility's juveniles in a hallway.  See Camera 5 at 23:00.  Four police officers approach the juvenile, surround her, pin her against a wall, and force her to the ground.  Id. at 23:00-24:00.  Officer D'Alto faces the camera as he kneels near the head of the now-prostrate juvenile.  Id.  Officer Milentijevic is standing behind and to Officer D'Alto's left.  Id.  At approximately 4:00:09 p.m., Officer D'Alto reaches his right hand up to his waistband.  Id. at 23:45-50.  At 4:00:13 p.m., Pitlock, who is in the hallway behind Officer D'Alto, bends down.  Id. at 23:50-55.  Her hands and lower arms are obscured from view by Officer D'Alto's body.  Officers D'Alto and Milentijevic and a SCO staff member turn their heads and twist around toward Pitlock, and each appears to speak to her—all in a span of three to four seconds.  Id.

By 4:00:18 p.m., Officer D'Alto has already turned his attention back to the juvenile.  Id. at 23:55-24:00.  Approximately one second later, Pitlock leans down a second time behind Officer D'Alto.  Id.  Again, her hands and lower arms are completely obstructed by Officer D'Alto's body.  Id.  Officer Milentijevic sees Pitlock leaning down and extends his hand towards her as she rises up.  Id.  As she stands fully upright, Pitlock disappears around a corner from the camera's view.[3]  Id.  At approximately 4:00:22, an arm comes into the camera's view and makes contact with Officer Milentijevic's chest.  Id. at 24:00-05.  No other part of the body to whom the arm belongs is visible.  Approximately two seconds later, Officer Milentijevic also goes out of view around the corner.  Id.  Two seconds after that, he reenters the camera's sightline, grasping onto an arm.  Id.  By 4:00:37, Officer Milentijevic and Pitlock are back in the camera's

---

[3]  Another of the Facility's cameras has a view of Pitlock's location around the corner.  See Camera 9.  But the relevant action, as seen through that camera's lens, occurs under a shadow cast by a stairwell.  Accordingly, it is difficult to reliably discern any movements in the darkness.

5

view, and Officer Milentijevic has restrained Pitlock, whose wrists are behind her back. Id. at 24:18-32. He leads her down the hallway. Id.

The entirety of the interaction between Pitlock and the officers takes place in a two-minute window.

**2.      Rasin's Arrest**

a.      The Officers' Account

Officer D'Alto testified that after the officers had placed Pitlock under arrest, "[a]nother staff member proceeded to step in front of Officer Milentijevic and Ms. Pitlock." D'Alto Dep. at 68:7-10. He identified that staff member as Rasin, and testified that when she stepped in front of Officer Milentijevic and Pitlock, she was "screaming and yelling, 'no, no,'" and was "very loud, very hysterical." Id. at 69:15-18. He testified that Rasin "touched Ms. Pitlock and . . . prevented Officer Milentijevic from continuing walking [Pitlock] out of the facility." Id. at 69:25-70:3. He testified that both he and Officer Milentijevic told Rasin to move, and that when she did not comply, officers pinned her against the wall and handcuffed her. Id. at 70:24-75:15.

Officer Milentijevic testified that Rasin did not stand in front of him but instead "stepped in front of Ms. Pitlock." Milentijevic Dep. at 65:11-14. Although he testified that Rasin "was preventing us from leaving," id. at 66:25, he could not recall what he said to Rasin, apart from "telling her to get out of the way," and could not recall if Rasin responded. Id. at 67:19-24; 68:19-22. He testified, "another officer had to physically move Ms. Raisin [sic] out of the way so that I can proceed out of door." Id. at 70:23-25.

Both officers testified that they estimated Rasin blocked Officer Milentijevic's path for at least 30 seconds. Id. at 77:6-12; see also D'Alto Dep. at 71:10-13.

6

b. Rasin's Account

While the officers were struggling to place the juvenile into handcuffs, another juvenile "began jumping up and down," and Rasin left the area where the arresting officers were located to attend to the other juvenile. Rasin Dep. at 173:6-14. At that point, Rasin had her back towards the scene with the officers for an estimated five to eight minutes; "what got [her] to turn around was the fact that Chynna Pitlock actually screamed [her] name and then [she] turned around and saw everything that was going on behind [her]," namely, that Pitlock was in handcuffs. Id. at 174:7-175:7. In response to observing Pitlock under arrest, Rasin testified that she took the following actions:

> I actually came over with my hands up and I was just like, "Whoa, whoa, whoa," like, you know, "What's going on?", like, you know, trying to talk to [the arresting officer], telling me him [sic] that, you know, that's a staff member, like maybe he was confused, but that's a staff member, and he pretty much wasn't paying me no attention so . . . So then I redirected my attention to Chynna.

Id. at 175:8-17. She testified that she was standing in front of Pitlock, and stated,

> Right before I started talking to Chynna I heard the door open behind me and then the salt and pepper officer actually yelled, "Get the F out the way," and then the rest of the officers just threw me up against the wall and then threw me up against the other wall and then started yelling, "Stop resisting, stop resisting," and then one of them pulled me [sic] arm up my back and was twisting my hand.

Id. at 177:9-16. She testified that she put her own arms behind her back, and she did not resist their arrest. Id. at 178-79.

c. Surveillance Footage

At approximately 4:00:50 p.m., Officer Milentijevic leads Pitlock, in handcuffs, into the Facility's vestibule. Camera 1 at 25:05. They rest there for approximately two and a half minutes, while various individuals—staff and officers—appear to speak with the pair. Id. at

7

25:05-27:50. At approximately 4:03 p.m., Officer Milentijevic begins to lead Pitlock to the outside door. Id. at 27:50. Rasin walks briskly into the camera's view, steps in front of Milentijevic and Pitlock, and appears to briefly speak to them. Id. at 27:55-28:05. At 4:03:15, Rasin places a hand on Pitlock's shoulders. Id. at 28:00. Almost instantly, Milentijevic grabs Rasin's hand off of Pitlock's shoulder and yanks her arm upwards and to the side, putting Rasin off balance. Id. at 28:01. The very next second, two other officers slam Rasin against the wall and arrest her. Id. at 28:01-15.

**3.     Subsequent Proceedings**

Both Rasin and Pitlock spent the night in jail. See Arrest Record, Ex. J to Shroyer Decl., Dkt. #57-10. Officer D'Alto processed the arrest papers. D'Alto Dep. at 82-83. All charges were disposed of through an adjournment in contemplation of dismissal pursuant to N.Y. C.P.L.R. §170.55 at plaintiffs' arraignments the day after the incident. See Certificates of Disposition, Ex. K to Shroyer Decl., Dkt. #57-11. The Facility closed four days after the incident. Rasin Dep. at 34:19-20.

Rasin and Pitlock commenced this action on October 2, 2014, bringing claims pursuant to 42 U.S.C. § 1983 for false arrest against the officers and municipal liability against the City of New York. At a status conference on December 3, 2015, plaintiffs agreed to abandon the claim for municipal liability if the action went to trial. See Minute Entry, Dkt. #36. On March 4, 2016, defendants filed the instant motion for summary judgment on the false arrest claims and on the basis of qualified immunity. See Mot. for Summ. J., Dkt. #53.

**STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994). Once this burden is met, to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998).

To assess the appropriateness of summary judgment, a court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)). In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

**DISCUSSION**

Claims alleging false arrest under § 1983 are generally analyzed under the law of the state where the arrest occurred. Russo v. City of Bridgeport, 479 F.3d 196, 203 (2d Cir. 2007). A § 1983 claim for false arrest is "substantially the same" as a false arrest claim under New York state law. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). In New York, a false arrest occurs when a defendant, acting without privilege or consent, intentionally confines a plaintiff who is conscious of the confinement or harmed by it. Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118

9

(2d Cir. 1995).

Probable cause creates a privilege for officers to arrest, so "[i]f there was probable cause for the arrest, then a false arrest claim will fail." Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003). An officer has probable cause when she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant, 101 F.3d at 852. "Where, as here, 'there is more than one officer cooperating in the investigation, the knowledge of each officer is presumed to be shared by all.'" Alvarez v. Cty. of Orange, N.Y., 95 F. Supp. 3d 385, 392 (S.D.N.Y. 2015) (quoting Abdul-Rahman v. City of New York, No. 10-CV-2778, 2012 WL 1077762, at *5 (E.D.N.Y. Mar. 30, 2012). Whether an officer had probable cause is a question appropriate for determination at the summary judgment phase only when "there is no dispute as to the pertinent events and the knowledge of the officers." Alvarez, 95 F. Supp. 3d at 393 (internal quotation marks omitted); see also Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir. 1994).

Defendants argue that the officers had probable cause to arrest both Pitlock and Rasin for obstruction of governmental administration ("OGA") in the second degree. A person is guilty of OGA in the second degree, in relevant part, when "he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . ." N.Y. Penal Law § 195.05. In addition to intent and actual or attempted obstruction or impairment of a government function, a violation of the statute requires physical interference. Esmont v. City of New York, 371 F. Supp. 2d 202, 210 (E.D.N.Y. 2005) (citing People v. Stumpp, 493 N.Y.S.2d 679, 680 (Dist. Ct. Suffolk

Cty. 1985)).

The physicality requirement need not be met by physical force, but must be "in part, at least, physical in nature." People v. Case, 365 N.E.2d 872, 875 (N.Y. 1977) (radioing the location of a radar speed checkpoint to motorists is not sufficiently physical); see also People v. Baltes, 904 N.Y.S.2d 554, 556 (N.Y. App. Div. 2010) (physicality requirement met where, among other actions, defendant moved "increasingly closer to [officers attempting to perform a field sobriety test on another individual] and continued to interfere, despite admonitions to remain calm and quiet"). "Failing to obey a police order, in and of itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing government administration." Dowling v. City of New York, No. 11-CV-4954, 2013 WL 5502867, at *4 (E.D.N.Y. Sept. 30, 2013) (failure to obey orders to "back up" did not, by itself, create probable cause). Instead, the failure to obey must "create[] some other hazard or interference" for it to "rise to the level of obstruction necessary for obstructing government administration." Id.

1.  **Probable Cause for Pitlock's Arrest**

    a.  Reaching for the Pepper Spray

Defendants claim that each time Pitlock leaned down behind Officer D'Alto she attempted to dislodge from his right hand a canister of pepper spray. Pitlock denies that she tried to grab the canister and claims that she instead was simply warning Officer D'Alto about the juvenile's medical issues. Officer D'Alto acknowledged that he heard Pitlock's warnings. The video evidence does not clarify whether or not Pitlock made contact with or grasped for the canister because her hands are obscured from view.

Defendants rely on Rasmussen v. City of New York, 766 F. Supp. 2d 399, 403 (E.D.N.Y. Feb. 2, 2011), for the proposition that because "[a]n action for damages under § 1983 cannot turn

11

on the subjective evaluation of a plaintiff as to whether the intervention is morally or legally justified," it does not matter that Pitlock claims she was trying to intervene on behalf of the juvenile. In Rasmussen, the plaintiff had intervened (by plaintiff's account) to prevent an unjustified beating. Id. The court found that, despite the justification the plaintiff put forth, "[t]here is no dispute, even under Rasmussen's version of the facts, that she deliberately and physically interfered with a police operation because she considered the amount of force used to be excessive." Id. at 403. That is not the case here. Under Pitlock's version of the facts, she never grabbed for the pepper spray, but merely spoke to Officer D'Alto. Accordingly, unlike Rasmussen's conclusion, I cannot find as a matter of law that Pitlock physically interfered with a police operation.

Defendants' claims about what Officers D'Alto and Milentijevic saw seek to draw an inference from the video evidence in defendants' favor, namely, that Pitlock touched or swiped at the pepper spray. I cannot follow suit and draw the same inference in defendants' favor because the video evidence does not support it. Moreover, Rule 56 demands that I do precisely the opposite—draw all inferences in the light most favorable to Pitlock. In doing so, I find that the competing deposition testimony, unaided by any clear video evidence, creates a genuine dispute as to whether Pitlock intentionally physically interfered with Officer D'Alto in the manner asserted by defendants in seeking to establish probable cause.

      b.      <u>Making Contact with the Officer</u>

Defendants also ask me to conclude that, because Pitlock's arm came into contact with Officer Milentijevic's chest, he necessarily must have had probable cause to arrest her for intentionally interfering with the official function he was performing. Pitlock acknowledges that her arm came into contact with his chest, but claims she did not "strike" Officer Milentijevic, and

instead that they "ran into each other" because they were in such close proximity. Pitlock Dep. at 138-39. To be sure, the videos show a hand making contact with Officer Milentijevic's chest. But at the moment of contact, Pitlock is not view. "The video does not show whether just prior to the punch Ms. Pitlock loses her balance, it does not show what direction her body faced, and it does not show where her arms were positioned just before the supposed punch." Pls.' Br. at 5. Because Pitlock's position obscures her location and movements from the camera's view, and because the videos are not accompanied by sound, I can only attempt to discern what happened.

Defendants claim that "even if plaintiff Pitlock's contact with Officer Milentijevic had been incidental, it certainly did not <u>appear</u> to be anything short of purposeful conduct from his perspective." Defs.' Reply Br. at 11 (emphasis in original). But it is not Officer Milentijevic's subjective state of mind on which I can appropriately rely; instead, it is the "facts that he knows" that I look to when determining whether the circumstances, viewed objectively, establish probable cause to arrest. <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004). The parties disagree on these facts, and it is impossible to tell from the videos whether Pitlock's movements were accidental (or deliberate yet not intended to interfere). <u>See, e.g.</u>, <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 158 (2d Cir. 2001) (the "jury could reasonably have concluded that [officers] knew that [the arrestee]'s" shouting and banging on glass at a police station "was for the legitimate purpose of getting the desk officer's attention, not to cause public inconvenience, annoyance or alarm") (internal quotation marks omitted); <u>Gagnon v. Ball</u>, 696 F.2d 17, 20 (2d Cir. 1982) (in determining probable cause to arrest, "the jury was entitled to conclude that both officers were aware of Mrs. Gagnon's legitimate reason for shouting, but arrested her nonetheless."). Thus, I cannot find that as a matter of law the officers had probable cause to

13

arrest her for OGA.[4]

In sum, after many careful viewings of the videos, I conclude that a genuine dispute of fact remains as to the circumstances surrounding the physical contact between Officer Milentijevic and Pitlock. The parties have testified to two different stories, and the video evidence is not so conclusive as to determine this factual dispute as a matter of law. My function is not to resolve disputed issues, but simply to determine whether a genuine issue exists that can be tried. See Liberty Lobby, Inc., 477 U.S. at 249. I find that such an issue exists, and I accordingly deny summary judgment as to Pitlock's false arrest claims.

**2.    Probable Cause for Rasin's Arrest**

Defendants claim that the video footage definitively proves that Rasin obstructed Officer Milentijevic from performing the official function of walking Pitlock out of the building in handcuffs. The video evidence shows Rasin step in front of Officer Milentijevic and place a hand on Pitlock; Officer Milentijevic and others almost instantly restrain her.

Courts have found the existence of probable cause for OGA in situations where an individual approaches an officer in a threatening manner or otherwise interferes despite a direct request not to do so. For example, in People v. Baltes, the court upheld an OGA conviction where a defendant came "increasingly closer to [officers attempting to perform a field sobriety test on another individual] and continued to interfere, despite admonitions to remain calm and quiet." 904 N.Y.S.2d at 556. In People v. Tarver, the court found that "[t]he threatening approach by defendant toward the back of a police officer struggling to arrest a suspect . . . constituted a knowing, physical interference with and disruption of the official function." 591

---

[4] Nor can I find that—given the parties' competing stories and the ambiguous video evidence—there was probable cause as a matter of law that Pitlock committed assault. See Defs.' Br. at 9 (arguing that Pitlock's "assault against Officer Milentijevic" created probable cause).

N.Y.S.2d 907, 908 (N.Y. App. Div. 1992). And in Trapp-Miley v. City of New York, the court found probable cause existed for an OGA arrest when the plaintiff stuck her head through a window into a non-public area of a police station and threatened a victim who was seeking to provide a statement to the police. No. 09-CV-3933, 2012 WL 1068084, at *5-6 (E.D.N.Y. Mar. 29, 2012).

But these cases are all distinguishable from what the video in this case shows. Here, unlike Baltes, the video shows the officers arresting Rasin—apparently without any warning—mere seconds after she approaches. Unlike Tarver, the video does not show Rasin acting threateningly or aggressively. In fact, the video is in accord with Rasin's version of the facts—she approached the pair in order to inform Officer Milentijevic that Pitlock was an employee of the Facility. And unlike the blatant interference described in Trapp-Miley, Rasin only stopped Officer Milentijevic's progress for three seconds before officers restrained her. In short, the parties have not presented undisputed evidence that Rasin physically assaulted or made threatening movements toward Officer Milentijevic, that she disobeyed an order, or that she attempted to free Pitlock. To the contrary, the sheer brevity of the incident leaves doubt as to whether plaintiff can truly be said to have been interfering. See Zellner v. Summerlin, 494 F.3d 344, 377 (2d Cir. 2007) ("[T]here was no evidence that [Plaintiff's] conversation with [Defendant]—lasting 20-30 seconds by [Defendant's] own account—interfered with the police function in any way.").

Accordingly, drawing all inferences in Rasin's favor, I find that key questions of fact remain about what, if anything, Rasin said to Officer Milentijevic and whether Rasin's words would have made it clear to Officer Milentijevic that she did not intend to prevent any official function, or instead, whether she approached him in a belligerent manner. I agree with plaintiffs

that—on these facts, and in particular within the severely truncated time frame in which Rasin stood unrestrained in front of Pitlock—defendants have not met their burden to show that summary judgment is appropriate.

3.  **Qualified Immunity**

In the alternative, defendants argue that, even if I cannot grant summary judgment predicated on the existence of probable cause, I should grant summary judgment on the ground that the officers are entitled to qualified immunity for plaintiffs' arrests. Qualified immunity may shield an officer from liability for civil damages when the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), or when "it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights," Mandell v. Cty of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003). Qualified immunity in an a false arrest claim depends on whether the officers had "arguable probable cause," a lower bar that is met if "officers of reasonable competence could disagree on whether the probable cause test was met." Lennon v. Miller, 66 F.3d 416, 423 (2d Cir. 1995) (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991); see also Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994) (an officer is entitled to qualified immunity in a false arrest claim "when he reasonably believes that a reasonably prudent police officer would have acted even though a reasonably prudent police officer would not have acted").

Here, a determination of "arguable probable cause" turns on the same factual disputes that make it inappropriate for me to grant summary judgment based upon a determination of probable cause—i.e., whether Pitlock swiped at the canister, whether Pitlock intentionally hit Milentijevic, and whether Rasin actually interfered with the arrest of Pitlock. In such

16

circumstances, because the "arguable probable cause" determination simply turns upon whose story one believes, a court should not grant summary judgment on qualified immunity grounds. See, e.g., Weyant, 101 F.3d at 858 (when police officers' version of facts is "sharply disputed," "the matter of the officers' qualified immunity . . . cannot be resolved as a matter of law"); Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003) (qualified immunity is appropriate at the summary judgment juncture only if "the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right" (alteration in original) (internal quotation marks omitted)); Jean-Laurent v. Hennessy, No. 05-CV-1155, 2008 WL 3049875, at *16 (E.D.N.Y. Aug. 1, 2008) (collecting cases).

Because I cannot resolve the parties' factual disputes and credibility issues on summary judgment, and find that a jury must instead resolve them, I deny defendants' summary judgment motion on qualified immunity grounds.

**4.      Officer D'Alto's Reliance on Officer Milentijevic**

Defendants argue that Officer D'Alto cannot be personally liable for Pitlock's arrest even though he is listed as the official arresting officer because, in arresting Pitlock, he relied on Officer Milentijevic's statement that Pitlock had punched him, which, if true, would qualify as a battery. Defs.' Br. at 11, Defs.' Reply Br. at 12-15; see also Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (defining battery under New York law). Thus, the argument goes, Officer Milentijevic's statement about the punch sufficiently established probable cause for Officer D'Alto to fill out an arrest report, regardless of any allegations about swipes made at Officer D'Alto's pepper spray.

17

In assessing probable cause, police officers are "entitled to rely on the allegations of fellow police officers." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000); see also Husbands ex rel. Forde v. City of New York, 335 F. App'x 124, 128 (2d Cir. 2009) ("[W]hether probable cause exists does not depend on the accuracy of the fellow officer's observations, but rather whether it was reasonable for the arresting officer to rely on them." (citing Bernard v. United States, 25 F.3d 98, 103 (2d Cir. 1994)). "Probable cause may also exist where the officer has relied on mistaken information, so long as it was reasonable for him to rely on it." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010).

Defendants heavily rely on the Supreme Court's decision in Devenpeck v. Alford, 543 U.S. 146 (2004), for the proposition that "a claim for false arrest will be defeated whenever the arresting officer had probable cause to arrest the plaintiff for some crime." Defs.' Reply Br. at 13 (emphasis in original). They cite to cases in which courts relied on Devenpeck to determine "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." See, e.g., Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006). But Devenpeck and its progeny are concerned with "the validity of the arrest, and not . . . the validity of each charge." Jaegly, 439 F.3d at 154 (emphasis in original). They say nothing about whether a plaintiff may sustain a false arrest claim against a co-officer who was present at the scene of the arrest and on whose testimony defendants partially rely in seeking to establish probable cause. Devenpeck addresses whether probable cause exists; I have already determined that I cannot decide that question as a matter of law. Put another way, Officer D'Alto cannot escape liability by relying on Officer Milentijevic's statements when he also holds out his own statements to support a finding of probable cause, just as Officer Milentijevic cannot escape liability by doing the same.

Instead, the appropriate question to determine whether Officer D'Alto can be held liable to Pitlock for false arrest is whether he was personally involved in the arrest. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Officer D'Alto was unquestionably personally involved: he was present at the scene, he testified that Pitlock swiped at his pepper spray, he testified that he admonished her not to, and he took statements and prepared both her arrest report and signed and swore to the criminal complaint against her. See Criminal Complaint, Ex. G to Shroyer Decl., Dkt. #57-7; Arrest Report, Ex. I to Shroyer Decl., Dkt. #57-9.

Moreover, it would be entirely illogical to dismiss Officer D'Alto from Pitlock's case when one of defendants' primary assertions for there being probable cause to arrest Pitlock is Officer D'Alto's statements that she swiped at him while he was threatening to use pepper spray on a restrained juvenile, see Defs.' Br. at 8-9 ("Because plaintiff Pitlock interfered with Officer D'Alto's effort to apprehend the juvenile, there was probable cause for her arrest, and her false arrest claim fails as a matter of law."); when Officer D'Alto relied on the allegation that Pitlock "did repeatedly attempt to slap [his] hands away from the apprehended juvenile" in the Criminal Complaint that he personally signed, see Ex. G; and when these allegations played a role in establishing the damages that Pitlock seeks "which stem from her initial confinement through her arraignment." Pls.' Br. at 18.

Because Officer D'Alto personally participated in the events that constitute the basis for the alleged probable cause asserted by defendants as a defense to the false arrest charges against them, his liability to Pitlock is a question of fact that should be submitted to a jury. See, e.g.,

19

Alvarez, 95 F. Supp. 3d at 399 n.1 ("the Court finds that even though there is no indication in the Amended Complaint that [the defendant] was present at the time of Plaintiff's arrest, Plaintiff adequately alleges that [the defendant] was personally involved for liability purposes" because, among other things, the defendant "participated in and oversaw the investigation that led to the arrest of Plaintiff").

## CONCLUSION

For the reasons described above, I deny defendants' motion for summary judgment as to Officers D'Alto and Milentijevic. Because plaintiffs have withdrawn all claims against Officer Evans, the claims against him are dismissed, and the Clerk is directed to close the case against him.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated: May 4, 2016
Brooklyn, New York